**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PEDRO IMPERIAL VEGA,
  *Petitioner-Appellant*,

v.

CHARLES L. RYAN; CARSON
MCWILLIAMS,
  *Respondents-Appellees*.

No. 12-15631

D.C. No.
4:09-cv-00473-
CKJ

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
September 12, 2013—San Francisco, California

Filed May 19, 2014

Before: Mary M. Schroeder and Jay S. Bybee, Circuit
Judges, and Ralph R. Beistline, Chief District Judge.[*]

Per Curiam Opinion

---

[*] The Honorable Ralph R. Beistline, United States District Judge for the
District of Alaska, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel withdrew an opinion filed November 13, 2013, and filed a new opinion reversing the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging the petitioner's conviction of sexually abusing his stepdaughter.

The panel held that the state court's application of *Strickland v. Washington* was objectively unreasonable because trial counsel was ineffective when he failed to review the petitioner's client file and failed to interview, and then call as a witness, the priest to whom the victim had recanted her allegations of her stepfather's sexual abuse. The panel held that because counsel has a duty to investigate even if his or her client does not divulge relevant information, reasonable jurists could not disagree that trial counsel's performance here was deficient.

Regarding prejudice, the panel held that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The panel concluded that the state court's finding that the priest's testimony would have been cumulative and would have had no effect on the verdict is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Patricia A. Taylor (argued), Law Office of Patricia A. Taylor, Tucson, Arizona, for Petitioner-Appellant.

Thomas C. Horne, Attorney General, Kent Cattani, Division Chief Counsel, Joseph T. Maziarz, Section Chief Counsel, David A. Sullivan and Nicholas Klingerman (argued), Assistant Attorneys General, Tucson, Arizona, for Respondents-Appellees.

**ORDER**

The Opinion filed November 13, 2013, and appearing at 735 F.3d 1093, is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

**OPINION**

PER CURIAM:

Petitioner Pedro Imperial Vega was convicted of sexually abusing his stepdaughter. In this appeal of the district court's denial of his petition for a writ of habeas corpus, Vega argues that his trial counsel was constitutionally ineffective when he failed to review Vega's client file and, as a result, failed to call as a witness a Catholic priest to whom the victim had recanted her allegations of her stepfather's sexual abuse.

We hold that reasonable jurists could not disagree that counsel's failing deprived Vega of his constitutional right to effective counsel. Accordingly, the state court's decision was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). The district court erred by denying Vega's petition and we reverse.

## I. BACKGROUND

Pedro Vega was convicted of contributing to the delinquency of a minor, molestation of a child, and three counts of sexual abuse of a child under fifteen, based on incidents that occurred between 1995 and 1999. The victim was Vega's stepdaughter, B. As detailed by the Arizona Superior Court:

> In 1996, the victim (B.) originally raised molest allegations, such which formed the basis for Counts 1–3. Those allegations were originally charged in the federal system, then dismissed after Petitioner's attorney (Denise Shepard) in that case learned that the victim had recanted such allegations, both to her mother, and a priest, Father Daniel P. McLaughlin. Those charges were later reinstated in state court (CR-53329, in which Petitioner was represented by Ralph Ellinwood), but dismissed after Mr. Ellinwood learned of the recantations. Counts 4–8 arose from allegations made by the victim in 2001.[1]

---

[1] All mistakes in original.

State charges were brought for a third time following a new set of allegations by B, and the grand jury indicted Vega on three counts based on the first set of allegations (counts 1–3) and five counts based on the second set of allegations (counts 4–8). Yet a third lawyer, David Darby, represented Vega at trial. After two mistrials, a jury found Vega guilty of five of the eight counts.[2] He was sentenced to twenty-eight years in prison.

Both Vega and B testified at his trial, and the trial largely turned on their testimony and the testimony of other family members. During the trial, B testified that she recanted the first set of allegations to her mother, but no evidence was introduced that she had also recanted to Father McLaughlin ("Father Dan").

After Vega's conviction, his counsel filed a motion for a new trial or to vacate judgment, on the grounds that he had just learned that the victim had recanted her allegations to Father Dan. The trial court held an evidentiary hearing where it heard testimony from several witnesses. First, Father Dan testified—for the first time in the trial court—that B's mother, Molly Vega, brought B to his office, that he spoke with B alone, that there was a "crisis in the family," and that B told him "he [Vega] didn't do it." He stated that because it was not a "confessional matter," he was "at liberty to tell [the court] what the nature of the conversation was." Second, Vega's first two attorneys, Denice Shepherd and Ralph Ellinwood testified. Shepherd represented Vega when he was charged with federal offenses that were later dismissed. She

---

[2] The jury convicted Vega on count one, a lesser-included offense on count three, and counts five, six, and eight. The jury could not reach a verdict on the other counts.

recalled that she first learned of B's recantation to Father Dan from B's mother, Molly. In her written notes from that conversation, she wrote down Father Dan's contact information and underneath it wrote "[B] told him Dad didn't do it." She later spoke with Father Dan and he confirmed that B had recanted. Attorney Ellinwood was a public defender who represented Vega against the first set of state charges that were also dismissed. Ellinwood kept notes from two conversations he had regarding Father Dan. His notes, which were in Vega's case file and are in the record before this court, reflect that he met with Vega, who told him that "[B] recanted to [Father Dan]." He later met with Molly, and his notes reflect "Father Dan – told him Daddy never did anything to her." Third, Judge Howard Fell, who was the county attorney who prosecuted the second case, testified that he had no recollection of the case, but authenticated his hand-written notes (which he surmised were notes of a phone conversation with Ellinwood), which read in part: "There is no reasonable probability of success [in obtaining a conviction.] . . . There are recantations from the beginning that the child still [maintains]." He confirmed that the charges against Vega were dismissed.

Vega's counsel in the third case, Darby, testified and advised the court that he learned of the victim's recantation to Father Dan from B's aunt about a week to two weeks after the verdict. He also admitted that it was possible that Vega had mentioned the matter to him, but that he had not seen Ellinwood's hand-written notes about B's recantation to Father Dan in his client file. He later told the court that he "[did not] remember reviewing any records of Mr. Ellinwood." Counsel acknowledged that if Vega knew that B recanted to Father Dan and did not tell him, Vega "d[id] so at his own peril," but urged the court to vacate the conviction

on due process and *Brady[3]* grounds.    Darby also acknowledged that if the court refused to grant a new trial, he would have to argue that he provided ineffective assistance to Vega.    Following the hearing, the trial court denied the motion for a new trial or to vacate because Vega and his two prior counsel were aware of B's recantation to Father Dan, and thus Father Dan's statements were not "newly discovered" evidence under Ariz. R. Crim. P. 24.2(a)(2).

On direct appeal to the Arizona Court of Appeals, Vega argued that the trial court had erred by denying his motion for judgment of acquittal or a new trial.    The Arizona Court of Appeals denied his appeal on the merits, agreeing with the superior court that B's recantation to the priest was not "newly discovered evidence."    The court of appeals also agreed with the trial court that "[a]t a minimum . . . Vega did not exercise due diligence" because "B.'s mother, Vega's sister and presumably Vega himself all knew and told others about B.'s statements to the priest."    Finally, the court of appeals concluded that the evidence would not have been material because "the priest's proffered testimony about B.'s statements would merely have been cumulative to B.'s own testimony that she had recanted her allegations to her mother and a counselor."[4]    The court concluded that there was not a "reasonable probability" that the priest's testimony would have changed the outcome of the case.  The Arizona Supreme Court summarily denied review.

---

[3] *Brady v. Maryland*, 73 U.S. 83 (1963).

[4] The court of appeals agreed with the trial court that there was no evidence the state knew of B's recantation to Father Dan, and thus there was no *Brady* violation.

Vega then sought state post-conviction relief on the grounds of ineffective assistance of counsel. The Arizona Superior Court held a two-day evidentiary hearing in 2008, and issued a detailed minute order. Reciting the standard for ineffective assistance of counsel under *Strickland*, the court refused to find

> ineffective assistance in that [counsel] failed to investigate the victim's recantation to "Father Dan." This Court, at trial, determined that *Petitioner himself* was aware of the recantation. . . . The Court declines to find post-conviction relief appropriate on this ground, given that a defendant is responsible for assisting counsel with his defense. It is illogical and unreasonable to hold [counsel] responsible for Petitioner's failure to divulge such information to him. Clearly, counsel's performance did not fall below the standard, and Petitioner cannot have been prejudiced, as he was aware of the recantation and himself, failed to reveal it to counsel.

The court concluded:

> The requirements of *Strickland* are clear: Petitioner must demonstrate both that counsel's efforts fell below the standard prevailing in the community, and that these failings prejudiced him. The Court finds that Petitioner has failed [to] demonstrate that counsel's efforts fell below the prevailing professional norms. The Court further finds that, even assuming *arguendo* that counsel's

efforts fell below standards, Petitioner has failed to prove prejudice as a result of those actions. The evidence against Petitioner included, but by no means was limited to: B.'s testimony; the fact that Petitioner failed to deny the molests to both B.'s mother and the police; and that B.'s brothers each provided facts that provided corroboration as to elements of her testimony.

(footnote omitted). The Arizona Court of Appeals granted review, but "[s]eeing no reason to repeat the trial court's analysis here," it adopted the trial court's decision and denied relief. The Arizona Supreme Court again summarily denied review.

Having exhausted his state remedies, Vega initiated the instant federal habeas proceedings, seeking relief pursuant to 28 U.S.C. § 2254. In a report and recommendation, the magistrate judge recommended denying the petition on the merits. The district court agreed with the magistrate judge's report, noting specifically that "[i]n light of the victim's testimony [that she had recanted], the additional instances of recantations would have been 'largely cumulative in their basic effect.'" The district court then concluded that "[g]iven the reasons the Arizona courts stated for not granting relief, this Court does not find that the state courts' decision involved an unreasonable application of federal law." However, the district court granted a certificate of

appealability for Vega's ineffective assistance of counsel claim. Vega timely appealed.[5]

## II. DISCUSSION

### A. *The AEDPA Standard*

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, habeas relief can be granted only if the state court's proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

A decision involves an "unreasonable application" of clearly established federal law under § 2254(d)(1) if it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Thus, "[t]he pivotal question is whether the state court's application" of the Supreme Court precedent "was unreasonable[,]" *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), as opposed to merely "incorrect or erroneous[,]" *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). In applying this standard, we must give "state-court decisions . . . the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)

---

[5] Vega argues that counsel failed in other respects. Because we find counsel's failure to call Father Dan dispositive, we do not address Vega's other claims of error.

(per curiam), and we will refrain from issuing a writ "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

Under § 2254(d)(2), the "unreasonable determination" clause, "a state-court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (internal quotation marks and citation omitted). Instead, we presume that the state court's factual findings are correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. *Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (citing 28 U.S.C. § 2254(e)(1)).

B. *Ineffective Assistance of Counsel*

The "clearly established federal law" for ineffective assistance of counsel claims is articulated in *Strickland*. *See Williams*, 529 U.S. at 390. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). To succeed on a *Strickland* claim, a defendant must prove that (1) his counsel's performance was deficient and (2) he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 687–88.

Counsel is constitutionally deficient if the representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* (internal quotation marks and citation omitted). When evaluating counsel's conduct, "we must make every effort 'to eliminate the distorting effects of hindsight, . . . and to evaluate the conduct from

counsel's perspective at the time.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 988 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 687–88).

A defendant is prejudiced by counsel's deficient performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome" of a proceeding. *Id.* Thus, a petitioner need not prove "counsel's actions more likely than not altered the outcome," but rather he must demonstrate that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 791–92 (internal quotation marks and citation omitted).

Because we are reviewing the Arizona courts' assessment of counsel's performance under AEDPA, our review is necessarily "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123(2009): Subject to the constraints of *Strickland*, the Arizona courts must defer to counsel's judgments, and, subject to AEDPA's standards, we must defer to the Arizona courts' assessment of counsel's judgment. We recognize that our state-court colleagues have the same duty we have to adjudicate claims of constitutional wrong, and, subject to AEDPA, we will respect their judgments. *Burt*, 134 S. Ct. at 15–16; *see also Stone v. Powell*, 428 U.S. 465, 494 n.35 (1976).

We apply the doubly deferential standard to review the state court's "last reasoned decision." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). Here, the Arizona Superior Court's decision denying Vega's petition for post-conviction relief is the last reasoned decision because

the Arizona Court of Appeal's adopted the Superior Court's reasoning and the Arizona Supreme Court summarily affirmed.

### 1.  Deficient representation

In this case, the Arizona Superior Court properly recognized the authority of *Strickland* and correctly cited its two prongs.    Applying *Strickland*, it determined that "counsel's performance did not fall below the standard" because "a defendant is responsible for assisting counsel with his defense" and "[i]t is illogical and unreasonable to hold [counsel] responsible for Petitioner's failure to divulge [B's recantation to Father Dan] to him."  With all due respect, we hold that the state court's conclusion in this regard is an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

First, the state court's holding that counsel had no responsibility to obtain information known to his client is an unreasonable application of Supreme Court precedent.  In *Rompilla v. Beard*, the Supreme Court stated, in an AEDPA case, that counsel was ineffective in failing to examine the defendant's prior-conviction file for mitigating evidence. 545 U.S. 374, 387–89 (2005).  There, counsel failed to present substantial mitigation evidence during the penalty phase of a capital murder case even though the evidence was documented in the "readily available" file on Rompilla's prior conviction.  *Id.* at 383–85.  The Court found this point "clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction."  *Id.* at 383.  The Court observed that "Rompilla's own contributions to any mitigation case were minimal," "[t]here were times

when Rompilla was even actively obstructive by sending counsel off on false leads," and Rompilla's family members were not helpful. *Id.* at 381. Despite the difficulties counsel had with their client, the Court held that "[n]o reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations [about potential mitigating evidence]." *Id.* at 389. Because of counsel's deficiency, the Court held that the "state courts were objectively unreasonable in concluding that counsel could reasonably decline to make any effort to review the file." *Id.* at 390.

*Rompilla* is dispositive here. The records Rompilla's counsel failed to investigate included Rompilla's school records, prior conviction records, and mental health reports—all matters that Rompilla himself would have had some knowledge of and could have assisted counsel in determining whether such documents would have produced probative mitigation evidence. The Court made clear in *Rompilla* that counsel had a duty—independent of whatever knowledge his client may have—to make reasonable investigation including, at a minimum, reviewing "the court file" on Rompilla's prior conviction. If Rompilla's counsel had a duty to review the court file *in a prior case*, it is minimally incumbent on Vega's counsel to review the file of the previous attorneys who handled the charges *in the same case*.

We think it apparent from *Rompilla* that the client's own knowledge of what is in his file is irrelevant to the discharge of his counsel's duty. We applied this principle in *Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012), a pre-AEDPA case. Stankewitz's conviction following his first trial was reversed on appeal because of a conflict with counsel. *Id.* at 1165.

Prior to his second trial, new counsel was appointed, and the second counsel failed to present mitigating evidence. *Id.* at 1166. "[D]espite [his] possession of [prior counsel's] files, he did not investigate *any* of the evidence contained within them. He did not contact [prior counsel] to discuss the contents of the files." *Id.* at 1171. Relying on *Rompilla* and *Wiggins v. Smith*, 539 U.S. 510 (2003), we had little difficulty finding ineffective assistance of counsel "because, despite the fact that the evidence 'was in [his] hands,' he 'failed to do any further investigation or development of this critical mitigation evidence.'" *Id.* at 1172 (alteration in original) (quoting *Summerlin v. Schriro*, 427 F.3d 623, 632 (9th Cir. 2005) (en banc)).

Here, it is undisputed that Vega's first two attorneys documented Father Dan's exculpatory testimony in Vega's file, which his trial counsel neglected to read. As in *Rompilla*, the fact that Vega did not take it upon himself to inform his counsel about Father Dan did not excuse counsel from conducting a rudimentary investigation. After *Rompilla*, talking with a client is not an adequate substitute for reading the client's case file.

Second, but relatedly, it is also clearly established federal law that counsel is deficient if he or she possesses exculpatory evidence but has no strategic reason for withholding it. In *Wiggins*, counsel for the guilt-phase of a death penalty trial informed jurors "'[y]ou're going to hear that Kevin Wiggins has had a difficult life' but '[d]uring the proceedings themselves, [ ] counsel introduced no evidence of Wiggins' life history.'" 539 U.S. at 515. There, counsel were aware of appellant's background, including Wiggins' terrible childhood, and they knew "[t]hey had available to them both the presentence investigation report [ ] prepared by

the Division of Parole and Probation, . . . as well as 'more detailed social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation.'" 539 U.S. at 518 (internal citation and quotation marks omitted). Nevertheless, counsel decided not to present any of the powerful mitigating evidence.   Applying *Strickland*, the Court decided that counsel's conduct constituted a Sixth Amendment violation because "a competent attorney, aware of [Wiggins's] history, would have introduced it at sentencing in an admissible form." *Id.* at 535.

Here, Vega's previous two attorneys documented exculpatory evidence in Vega's client file.  For example, Shepherd wrote that the victim told Father Dan that "Dad didn't do it" and that B told her mother she needed "to get this off my chest."  Similarly, Ellinwood wrote "Father Dan — [B] recanted to him."   Yet a third note included information about the victim's question, "Mom what if I was lying what would they do?" and "Father Dan — told him Daddy never did anything to her."   Vega's trial counsel admitted, however, that he did not remember the contents of Shepherd's notes and did not remember reviewing Ellinwood's notes.  On the motion for a new trial, the County argued that B's recantation to Father Dan was not newly discovered evidence, but rather that  "[t]here [was] no due diligence done in finding out this information by current counsel," and that trial counsel "was ineffective for not finding out this information."  And Darby admitted that, if the court refused his request for a new trial on the grounds of newly discovered evidence, he would be forced to confess his own ineffective assistance.  So, like counsel in *Rompilla*, Vega's counsel was deficient because he failed to read Vega's case file even though the case's procedural history put

counsel on notice that the federal government and Arizona had previously dismissed the charges against his client and the arguably exculpatory evidence was "at his fingertips."

While *Strickland* protects "strategic choices made after thorough investigation of law and facts," 466 U.S. at 690, had Darby known of B's recantation to Father Dan, there was no strategic reason for not calling Father Dan as a witness. He was available to testify and told the court that he had not heard B's statement in confessional and, thus, was willing to testify as to what she told him. Importantly, Father Dan was not a member of the family and had no reason to misrepresent B's recantation. He thus would have brought credibility to B's mother's claims that B had recanted to her.

We recently applied *Strickland* in an AEDPA case in which there was also a failure to investigate evidence of a recantation. In *Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013), Cannedy was convicted of committing lewd and lascivious acts on his stepdaughter. *Id.* at 1151. Cannedy alleged that his counsel was ineffective because he ignored evidence that the victim had recanted her allegations in an internet posting to a friend. *Id.* at 1161. As in this case, Cannedy's "trial was largely a 'he said, she said' case, with no physical evidence linking [Cannedy] to the alleged abuse." *Id.* Cannedy was the sole witness in his defense, and his only defense was that the victim had fabricated the allegations. *Id.* The internet posting would have explained the victim's motive to implicate Cannedy falsely. *Id.* Under these circumstances, "[n]o competent lawyer would have declined to interview such a potentially favorable witness when that witness had been clearly identified, the witness was easily accessible and willing to provide information, and trial counsel faced a dearth of defense witnesses." *Id.*

We reach a similar conclusion here. There is no dispute that counsel's failure to review his client's file led to a failure to present a key witness to the jury. *Strickland* and *Rompilla* tell us that a reasonable lawyer would not have committed such a lapse. Even viewing the facts as a defense lawyer would have done at the time we can conceive of no circumstances where the decision not to read a client's file—a file prepared to answer the same charges—would be reasonable. Furthermore, there can be no suggestion that counsel made a strategic decision not to interview or call Father Dan because counsel did not even know about the victim's recantation to Father Dan until a one or two weeks after the trial. *See Thomas v. Chappell*, 678 F.3d 1086, 1104–05 (9th Cir. 2012) (finding *Strickland* error when trial counsel's failure to call a witness could not be excused as a tactical decision because counsel did not have sufficient information to make an informed decision).

In light of the uncontroverted evidence before the Arizona Superior Court and the Arizona Court of Appeals, the state court's holding that Vega's counsel rendered effective assistance of counsel is an unreasonable application of clearly established federal law, namely *Strickland* and *Rompilla*. Because counsel has a duty to investigate, even if his or her client does not divulge relevant information, we hold that reasonable jurists could not disagree that trial counsel's performance here was deficient.

    2.  Prejudice

As we have previously observed, to prevail on his ineffective assistance claim, Vega must demonstrate prejudice as well as deficient performance. *Strickland*, 466 U.S. at 687–88. Ordinarily, to demonstrate prejudice, the

petitioner must show "it is reasonably likely the result would have been different" but for counsel's ineptitude. *Richter*, 131 S. Ct. at 792 (internal quotation marks and citation omitted). And "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.*; *see also Strickland*, 466 U.S. at 694 (holding that petitioner must prove there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

"Under AEDPA, we do not apply the *Strickland* standard de novo." *Gulbrandson*, 738 F.3d at 988. Instead of considering whether petitioner met the burden of proving prejudice, we must decide "whether the state post-conviction court was reasonable in determining that [the petitioner] was not prejudiced." *Id.* at 990. In assessing whether Vega was prejudiced by counsel's conduct "we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Cannedy*, 706 F.3d at 1163 (quotation marks and citation omitted); *see also Williams*, 529 U.S. at 397–98.

The Superior Court decided that Vega was not prejudiced by counsel's performance because counsel rendered effective assistance. Nevertheless, assuming arguendo that counsel's performance was deficient, the Superior Court found that additional recantation evidence would have been cumulative because "the jury heard [the victim] testify that she recanted to her mother." Thus, the Superior Court concluded, there was no prejudice because there was sufficient evidence against Vega, including the victim's testimony, which of itself was "enough to sustain a conviction for child molestation" under *State v. Munoz*, 561 P.2d 1238, 1241

(Ariz. 1976), and the testimony of other witnesses that corroborated B's testimony.

The fact that a child victim's testimony is sufficient evidence to sustain a conviction for child molestation does not mean that Vega was not prejudiced by his counsel's shortcomings. For that precise reason, when the child's testimony goes to the heart of the state's case, evidence that the victim has recanted her allegations to a responsible adult is critical to the defense. And when that evidence is not cumulative of other testimony, the defendant has been deprived of a key witness and has suffered prejudice.

The Arizona Court of Appeals found that "the victim's credibility was a central issue." Indeed, here as in *Cannedy*, "Petitioner's trial was largely a 'he said, she said' case, with no physical evidence linking Petitioner to the alleged abuse." 706 F.3d at 1161. Further, like many sexual abuse cases, the victim's credibility was essential both to the prosecution *and* to the defense. Vega's entire theory in defense was that B had fabricated her allegations against him. B's credibility was also a key issue because there was evidence that undermined both the victim's and Vega's testimony. On the one hand, the victim admitted that she recanted the first set of allegations. But, on the other hand, the victim's mother and brothers corroborated other aspects of her testimony. Here is the summary of the evidence from the Arizona Superior Court's opinion denying post-conviction relief:

> The requirements of *Strickland* are clear: Petitioner must demonstrate both that counsel's efforts fell below the standard prevailing in the community, and that these failings prejudiced him. The finds that

Petitioner has failed [to] demonstrate that counsel's efforts fell below the prevailing professional norms. The Court further finds that, even assuming *arguendo* that counsel's efforts fell below standards, Petitioner has failed to prove prejudice as a result of those actions. The evidence against Petitioner included, but by no means was limited to: B'.s testimony; the fact that Petitioner failed to deny the molests to Both B.'s mother and the police; and that B.'s brothers each provided facts that provided corroboration as to elements of her testimony.[4] . . . Accordingly, given the evidence, the Court finds that Petitioner was not rendered ineffective assistance of counsel at trial.

————————

[4] B.'s oldest brother, Emmanuel Ramirez, testified that he had eavesdropped on their mother speaking with Petitioner on the phone after the allegations were made, and that Petitioner answered Molly Vega's question "Did you do it?" with "Yes." Emmanuel went on to say that Molly Vegas then "went crazy and she got rid of anything like pictures and wedding, like everything with the wedding, burned it, threw stuff out. Emmanuel further testified that he remembered a time in the new house (the back house) when B. kept going in and out of a room in which Pete was, which story corroborated B.'s testimony as to the events surrounding one of the molests. B.'s

brother Daniel Bracamonte testified that he
recalled an occasion when Petitioner told him
to go to bed when B. Was allowed to stay up.
Daniel later heard tickling and laughing
coming from the master bedroom, where B.
and Petitioner were. Later tha[t] night, as B.
Came into the room in which the two were
sleeping he saw her wiping her eyes, as
though she was crying. This story closely
corroborates B.'s testimony that Vega
molested her while tickling her.

(references to trial transcripts omitted; footnote in original).
But this evidence, standing by itself, was likely not sufficient
to convict Vega without B's testimony. No one, except for B,
could testify to the acts of which she accused Vega.

The strongest corroborating evidence referred to by the
Superior Court was testimony from Emmanuel Ramirez, B's
older brother, that he had picked up a phone and overheard
his mother, Molly, ask Vega "did you do it" and that Vega
answered "yes." But Emmanuel's testimony was subject to
vigorous cross-examination:

> Q. Before you heard your mother ask [Vega]
> if he did it, and before you heard that answer,
> you don't know what your mother and [Vega]
> were talking about, do you?
>
> A. No.
>
> Q. You have no idea what they were talking
> about at the time, did you?

A. No.

Moreover, defense counsel elicited that Emmanuel, who was 18 at the time he testified and 14 or 15 at the time of the phone call, had been dealing cocaine since he was 14 and was using drugs on a daily basis during that period. He remembered little of the incident except for his mother's question and Vega's answer:

Q. Now, you don't remember any dates about when any of these things that you talked about happened, correct?

A. Correct.

Q. Is it because of a bad memory because of drug use back then?

A. No, I can't remember none of my childhood.

Q. None at all?

A. Nothing.

Q. What's the last thing you remember about your childhood?

A. Nothing.

Q. Just kind of all a blank to you?

A. I remember a little bit but nothing – I just can't really remember anything.

The evidence "that Petitioner failed to deny the molests to both B.'s mother and the police,"  has minimal probative value because silence is inherently ambiguous. *See United States v. Hale*, 422 U.S. 171, 176 (1975) ("In most circumstances silence is so ambiguous that it is of little probative force.").  When Molly confronted Vega about the allegations, he neither admitted nor denied molesting B:

> Q.  Well, he told you he didn't molest [B].
>
> A.  No, he didn't say that[.]  He allowed me to hit him on the face[.] I just hit him on the face and he wouldn't look[.] He wouldn't turn to see me, to look at me
>
> Q.  So you were beating on him?
>
> A.  I was hitting him in the face[.]  He broke my heart.
>
> Q.  What were you saying to him when you were beating on him?
>
> A.   I was saying like, "How could you," things like that.
>
> Q.  And he denied it[.] He said, "I didn't do anything?"
>
> A.   I told him to leave.  He couldn't say anything.

Although "[s]ilence gains more probative weight where it persists in the face of accusation," under these circumstances

it is questionable whether the "confrontation naturally called for a reply," *id.*, given that Vega "couldn't say anything."

Similarly, Vega's response, or lack there of, to police officer questioning was flimsy evidence. Lieutenant Neilsen informed Vega of his *Miranda* rights and interviewed Vega after he was arrested on February 6, 1996. The state asked Lieutenant Neilsen about Vega's demeanor during the interview:

> Q.   Can you describe for us his facial expression or what he did when you said you were investigating child molestation?
>
> . . . .
>
> A.  I did not see any emotion at all.
>
> Q.   Did he, after you told him you were investigating allegations of child molestation, did he deny engaging in child molestation?
>
> A.  No.
>
> Q.  Did he ever throughout the course of your discussion with him ever deny the allegations that were being made?
>
> A.  No.
>
> Q.  Did he admit them?
>
> A.  No.

Q.  What would he do?

A.  He would explain them.

Detective Dollar interviewed Vega, who voluntarily met officers at the sheriff's station, around April 28, 2000 after B made additional allegations.  Once again, the state asked about Vega's demeanor:

> Q.  When you talked to the defendant, Peter Vega, describe to us his demeanor.  What he was looking like or doing when you were talking to them.
>
> A.  Mr. Vega was fidgeting, playing with his hands, his thumbs.  He would look down frequently while [the detective] was asking questions of him.  He seemed to be somewhat nervous and he would wipe his brow with his hands.

During redirect examination, the detective agreed that many people are nervous during a police interview:

> Q.   Did you characterize Mr. Vega's demeanor when you spoke with him?  He was interviewed for an hour and a half about child molestation to be unusual, the way to act when being confronted by the police about child molestation?
>
> A.  Not necessarily, no.

Q.   You would expect somebody to be nervous right?

A.  Yes.

Q.  Especially being in the police department and being confronted by allegations of child molest, fidgeting and sweating and being nervous and fidgeting, that's not all that uncommon, is it?

A.  No.

Assuming arguendo that Lieutenant Neilsen's testimony was admissible, it had little probative value because "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle v. Ohio*, 426 U.S. 610, 617 (1976). Indeed, given that the "Self-Incrimination Clause [is] applicable to state interrogations at a police station," *Michigan v. Tucker*, 417 U.S. 433, 443 (1974), it is feasible that Vega did not want to say anything that could be used against him in court. *Miranda v. Arizona*, 384 U.S. 436, 469 (1966) ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.").

Further, Vega's nervousness was not particularly indicative of guilt.  After all, it is not unusual for a person to be nervous when interacting with a police officer. *Wren v. United States*, 517 U.S. 806, 817 (1996) (recognizing that even traffic stops entail "'a possibly unsettling show of authority"' and "may create substantial anxiety."' (quoting *Delware v. Prouse*, 440 U.S. 648, 657 (1979))); *see also*

*United States v. Chavez-Valenzuea*, 268 F.3d 719, 726 (9th Cir. 2001) ("Encounters with police officers are necessarily stressful for law-abiders and criminals alike."), *amended by United States v. Chavez-Valenzuela*, 279 F.3d 1062 (9th Cir. 2002). And nervousness is especially likely in an interrogation environment which "carries its own badge of intimidation" because it is "created for no purpose other than to subjugate the individual to the will of his examiner." *Miranda*, 384 U.S. at 457.

In addition, the other evidence referred to by the Arizona Superior Court corroborates B's testimony but only in a most superficial way—that on one occasion when B claims she was molested, B was present in a room with Vega,[6] and that on another occasion she appeared to be crying after Vega tickled her.[7] The details of what else may have happened—aside from being present in the room with Vega or being tickled by Vega—depend entirely on B's own testimony.

Both the state and the defense were well aware of the Vega's dysfunctional household. The state's theory was that Molly did not want to break up the family and pressured B to recant her testimony. At the post-trial hearing, the state argued that Father Dan's testimony would further its theory by demonstrating that Molly was willing to arrange for B to

---

[6] Specifically, Emmanuel testified that he remembered a time in the new house (the back house) when B kept going in and out of a room that Vega was in.

[7] Daniel Bracamonte, one of B's brothers, testified that he recalled an occasion when Petitioner told him to go to bed when B allowed to stay up. Daniel later heard tickling and laughing coming from the master bedroom, where B and Vega were.

see Father Dan and recant in order to save her marriage to
Vega. On the other hand, as the Arizona Superior Court
noted, "Mr. Darby's clear strategy was the defense of actual
innocence, contending that B. fabricated the allegations in
order to remove Vega from the household in an effort to
resolve the family's chaotic home environment." Counsel
argued that "these are fabricated allegations of molest'" and
that "Vega and Molly Vega's 'very chaotic, topsy turvy
alcohol-fueled, drug-fueled relationship that these kids were
exposed to' was a motivating factor in B.'s fabrications, as
'every time [B.] would say that Pedro Vega molested her, he
would be taken out of the house.'" Counsel "elicit[ed]
testimony from B. that both Vega and her mother were using
and selling drugs, and that this made B. mad."

    We, of course, cannot resolve these difficult questions of
credibility. But it is apparent that Father Dan's testimony
went squarely to the core issue in the case: Was B telling the
truth about Vega? And Father Dan's testimony was not
merely cumulative of Molly's testimony. It is true that the
jury heard Molly say that B had recanted her accusations, but
the jury never knew that one of her recantations was before
her local priest. Importantly, the recantation to Father Dan
was an occasion distinct from another recantation that B
made. Father Dan was not a witness to the conversation
between B and her mother. Rather, he testified at the
post-trial hearing that Molly brought B to him, and that he
spoke to her alone. The fact that a victim recants in front of
two people may make the testimony of one witness
cumulative to the testimony of the second witness. But when
the victim recants on two separate occasions to two different
people, it is harder to describe the testimony of the second
witness as merely cumulative of the first. In this case in
particular, where the family is so dysfunctional and family

members have pitted themselves against other family members, the testimony of Father Dan would have been of much greater weight than the testimony of B's mother, who, according to the state, had reason to want her daughter to recant. Father Dan had no such motive; he was not related to the family and would have been in a better position to judge B's demeanor.

Perhaps more importantly, Arizona law, like many other jurisdictions, has recognized the special relationship between priests and their parishioners. *See* Ariz. Rev. Stat. § 13-4062(3); *Waters v. O'Connor*, 103 P.3d 292, 295–97 (Ariz. Ct. App. 2004) (explaining that the priest-penitent privilege exists because of the "urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance" (quotation marks and citation omitted)); *see also Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return."). Father Dan testified that he did not hear B's recantation in confessional—neither he nor B has claimed-priest-penitent privilege—and thus he was free and willing to testify as to their conversation. Our point is not that the priest-penitent relationship is involved here, only that a priest's testimony, because of the special relationship and confidence that penitents have in their priests, may carry additional weight with a jury. At the least, B's conversation with Father Dan would have carried much greater weight with the jury than her recantation to her mother.

In sum, Father Dan's testimony "would have added an entirely new dimension to the jury's assessment" of the victim's testimony such that "there is a reasonable probability that the [unpresented] evidence would have altered at least one juror's assessment [of the evidence]." *United States v. Kohring*, 637 F.3d 895, 905–06 (9th Cir. 2010) (quotation marks and citation omitted). Father Dan's testimony would have undermined the prosecution's argument that the victim's mother had pressured her to recant in order to protect Vega (her husband), because the victim independently recanted—in private—to a priest who had no reason to pressure her. And, given the unique role that religious officials play in people's lives, the testimony of a priest who heard what he believed to be a sincere recantation could have tipped the scales in Vega's favor.

Finally, there is an additional indicator of prejudice here because the jury had a difficult time reaching a verdict.[8] *See Kotteakos v. United States*, 328 U.S. 750, 764 (1946) (discussing harmless error and explaining that "the appellate court can[not] escape altogether taking account of the [trial] outcome. To weigh the errors effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum."); *see also Stankewitz*, 698 F.3d at 1175; *Kennedy v. Lockyer*, 379 F.3d 1041, 1056 n.18 (9th Cir. 2001). Indeed, the jurors could not reach a unanimous verdict on three of the eight counts and the jury found Vega guilty of a lesser-included offense on the third

---

[8] The jury initially informed the court that it was deadlocked "with no apparent change of agreement." After receiving additional instructions the jury convicted Vega on count one, a lesser-included offense on count three, and counts five, six, and eight. The jury could not reach a verdict on counts two, four, and seven.

count. Given that at least one juror voted that Vega was not guilty on three counts, "there is a reasonable probability that at least one juror would have struck a different balance" on the remaining five counts had he or she heard Father Dan's testimony. *Wiggins*, 539 U.S. at 537.

Accordingly, we conclude that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 689. We further conclude that the state court's findings that Father Dan's testimony would have been cumulative and would have had no effect on the verdict is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). With all due respect for our state colleagues, the state court's application of *Strickland* was objectively unreasonable because Vega's counsel was ineffective when he failed to review his client's file and failed to interview and then call Father Dan in his client's defense. The Supreme Court has held that such a failure to investigate exculpatory evidence necessarily constitutes deficient performance even when the client knew of the evidence, but never informed his attorney. *Rompilla*, 545 U.S. at 383. Given that B's testimony was the cornerstone of the state's case, that Father Dan's testimony would have undermined her credibility, and that the jury struggled to reach the verdict, "there is a reasonably probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## III. CONCLUSION

The judgment of the district court is reversed. The case is remanded with instructions to grant the writ of habeas corpus.

**REVERSED AND REMANDED.**