# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 4, 2017                     Decided July 21, 2017

No. 16-3102

UNITED STATES OF AMERICA,
APPELLEE

v.

KHAN MOHAMMED,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cr-00357-1)

*Nathaniel H. Nesbitt* argued the cause for appellant. With him on the briefs was *Peter S. Spivack*.

*Vijay Shanker*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Trevor N. McFadden*, Deputy Assistant Attorney General, and *Matthew Robert Stiglitz*, Attorney. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  Appellant Khan Mohammed was extradited from Afghanistan to the United States and convicted, following a 2008 jury trial, of international drug trafficking and narcoterrorism, *i.e.*, using drug proceeds to fund terrorists or terrorism.  This case comes to us on direct appeal a second time, after this court affirmed Mohammed's sentence and conviction but remanded for an evidentiary hearing on his claim of ineffective assistance of counsel.  *See United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012).  We conclude that the performance of Mohammed's trial counsel was constitutionally deficient.  Counsel failed to investigate the possibility of impeaching the government's central witness as biased against Mohammed, despite ample indication that he should and could do so.  Our review persuades us, however, that counsel's deficient performance did not prejudice Mohammed as to the drug trafficking charge.  As to the narcoterrorism charge, we cannot on this record confidently assess prejudice, and therefore remand to the district court for further proceedings on that issue.

**I.**

We assume familiarity with our prior decision and the district court's opinion on remand.  *See United States v. Mohammed*, No. 06-357, 2016 WL 3982447 (D.D.C. July 22, 2016).  We recite here only those facts relevant to our disposition.

At a status conference more than two months before trial, Mohammed's trial counsel advised the district court that he intended to seek witnesses in Afghanistan on Mohammed's behalf, but noted that there were "very difficult obstacles in terms of finding witnesses, locating them, and then somehow bringing them to the United States under some type of parole visas."  2/25/08 Status Hearing Tr. at 9.  Months later, on the eve of trial, counsel confirmed that he "did look into … how do you even get [to Afghanistan], and who [from the office]

was I going to take," but there were "no volunteers." 5/2/08 *Ex Parte* Hearing Tr. at 38. Ultimately, as counsel conceded, he failed to "follow through" on his previously expressed intent to contact witnesses in Afghanistan. *Id.* Although the government provided a contact list from Mohammed's phone book in discovery, counsel never attempted to call any potential witnesses in Afghanistan and, in fact, mistakenly represented that he "wasn't given telephone numbers." *Id.* at 37.

The district court also asked Mohammed himself whether he had told counsel to contact any potential witnesses in Afghanistan. 5/2/08 *Ex Parte* Hearing Tr. at 21. Mohammed responded that he had "asked [counsel] to bring my witnesses," and specifically identified four witnesses who would say that he was not associated with the Taliban. *Id.* at 21-22. Counsel confirmed Mohammed had given him those four names but apparently thought the only way he could have spoken with the potential witnesses would have been to travel to Afghanistan, which he concluded posed "insurmountable" difficulties. *Id.* at 36.

One of the key issues on which witnesses in Afghanistan might have shed light was the credibility of the government's confidential informant and central witness at trial, a man known by the pseudonym Jaweed. Mohammed's trial counsel was aware of the possibility that Jaweed had a criminal history that could be useful in undermining his credibility, as shown by his request that the government perform a *Lewis* check— pursuant to *Lewis v. United States*, 393 A.2d 109 (D.C. 1978)—into Jaweed's criminal history in Afghanistan. That check produced no governmental records on Jaweed and counsel did not further pursue the issue.

Counsel briefly raised the possibility of impeaching Jaweed as biased against Mohammed. The two men, hailing

from the same village, had known each other for some time; indeed, Jaweed's mother once asked Mohammed if he would consider allowing Jaweed to marry Mohammed's sister, an inquiry that evidently did not yield the desired result for Jaweed. *See Mohammed*, 2016 WL 3982447, at *14. At a status conference a couple of weeks before trial, counsel noted that Jaweed had "been previously accused with a lawsuit." 4/22/08 Status Hearing Tr. at 6. But counsel represented (erroneously, it is now claimed) that the lawsuit did not involve Mohammed, and the district court advised that, barring some connection to Mohammed, evidence relating to the lawsuit would not be admissible to show bias. *Id.* at 5-8**.** The district court stated, however, that counsel would be free to explore possible bias arising from Mohammed's victory in a local election over Jaweed's cousin. *See id.* at 7-8. Counsel took no steps to investigate the election, Mohammed's potential connection to the lawsuit, or other possible sources of bias.

At trial, the government's case rested on two pillars: the recordings of Jaweed's undercover conversations with Mohammed, and Jaweed's own testimony, which addressed the meaning of those conversations and, more broadly, the two men's interactions. Jaweed's testimony was, as trial counsel later recalled, "the bread and butter of the case." 12/3/15 Evidentiary Hearing Tr. at 25. The government repeatedly asked Jaweed to clarify the meaning of exchanges between him and Mohammed. Mohammed identifies 118 such clarifications, but counsel objected only once, about halfway through. *See* Appellant Br. 7. On that occasion, the government asked Jaweed to clarify the meaning of Mohammed's statement, "I will, God willing, speak with them, this will be done and that, too, and the work will be ready." 5/12/08 A.M. Trial Tr. at 25. Counsel objected that the question called for speculation and lacked foundation. *Id.* at 25-26. The district court overruled the objection, explaining

that, in its view, Jaweed was "entitled to say what he understands Khan Mohammed to be saying." *Id.* at 27. Jaweed then testified that Mohammed "was trying to say that he would see or speak with [Taliban commanders, and] the work of missiles and the opium would be done." *Id.*

Trial counsel's cross-examination of Jaweed focused on the possibility that Jaweed had monetary incentives—he was paid $8,000 for his work as an informant, *see* 5/13/08 A.M. Trial Tr. at 86-87—to testify against Mohammed. He did not probe any preexisting bias on Jaweed's part against Mohammed. Trial counsel called no defense witnesses.

Mohammed appealed on several grounds, including ineffective assistance of counsel. This court affirmed the conviction and sentence and remanded for the district court to hold an evidentiary hearing on the ineffectiveness claim. *See Mohammed*, 693 F.3d at 195, 204. On the initial appeal, we noted that "the thrust of Mohammed's argument" was that "counsel should have made some effort to learn if the [potential] witnesses could undermine Jaweed's credibility in general, by testifying, for example, that he had a reputation for dishonesty or that he harbored a grudge against Mohammed." *Id.* at 203. The court determined that, because "Jaweed's testimony arguably shaped how the jury understood Mohammed's words," counsel's failure to challenge Jaweed's credibility could have been prejudicial and a remand was necessary for the district court to develop evidence and decide the issue in the first instance. *Id.* at 204.

On remand, the district court received declarations from Mohammed's appellate counsel and his trial counsel and held an evidentiary hearing at which trial counsel and Mohammed testified. Mohammed's appellate counsel stated that, in 2011, while working on Mohammed's first appeal, he managed to

interview 28 witnesses in Afghanistan over the phone. *See* Declaration of Shardul Desai ¶¶ 9-11 (Feb. 28, 2013). Those witnesses stated that Jaweed had a bad reputation for "criminal behavior and gangsterism," with one witness adding that he was "a liar and an oath-breaker," and that Mohammed was a well-regarded local leader who was not in the Taliban. *Id.* at ¶¶ 13-14, 20-21. Of particular note, one witness, Malek Rezwan, stated that he sat on a tribal arbitration council (*jirga*) with Mohammed in which Jaweed was found to have stolen jewelry, opium, and money. *Id.* at ¶ 16. Rezwan recalled Jaweed being particularly "vengeful" toward Mohammed for casting his vote in support of a ruling against Jaweed because he thought Mohammed should have voted "along village lines." *Id.* Rezwan said that he and others overheard Jaweed tell Mohammed: "I will not leave you alone even if it takes 20 years." *Id.*

The district court rejected Mohammed's ineffectiveness claim principally on the ground that trial counsel reasonably responded to matters that Mohammed timely brought to his attention for possible investigation. In particular, the court focused on the four potential witnesses whom, it found, Mohammed specifically identified for counsel. *See* 2016 WL 3982447, at \*17. The court concluded that counsel reasonably did not pursue those witnesses given the limited information he had, and that, in any event, Mohammed failed to establish that those witnesses would have provided helpful information. *See id.* at \*23.

## II.

To prevail on a claim of ineffective assistance of counsel, "the defendant must show that (1) his counsel's performance 'fell below an objective standard of reasonableness,' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different.'" *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984)). Reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). On appeal of a district court's denial of an ineffectiveness claim, this court reviews "for clear error any findings of historical fact embedded in the District Court's conclusions on deficient performance and prejudice," and reviews questions of law *de novo*. *United States v. Nwoye*, 824 F.3d 1129, 1135 n.4 (D.C. Cir. 2016); *see also Payne*, 760 F.3d at 13.

## A.

Mohammed principally contends that his trial counsel rendered constitutionally deficient performance by failing to investigate Jaweed's possible bias. Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "Where the case involves a failure to investigate, the 'particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *United States v. McDade*, 699 F.3d 499, 506 (D.C. Cir. 2012) (quoting *Strickland*, 466 U.S. at 691). Counsel reasonably may decline to investigate when she or he determines that any potential information an investigation might uncover would have limited value or "could be easily attacked on cross-examination." *Id.* at 507.

The complete failure to investigate potential impeachment witnesses cannot be construed as a strategic decision on the part of defense counsel. *See, e.g., Reynoso v. Giurbino*, 462 F.3d

8

1099, 1112 (9th Cir. 2006) ("[I]f counsel's failure to investigate possible methods of impeachment is part of the explanation for counsel's impeachment strategy (or a lack thereof), the failure to investigate may itself constitute ineffective assistance of counsel."); *Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003) ("Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel."); *cf. United States v. Debango*, 780 F.2d 81, 85 (D.C. Cir. 1986) ("The complete failure to investigate potentially corroborating witnesses . . . can hardly be considered a tactical decision."). "It is especially important that counsel adequately investigate the case," because "[o]nly when reasonable investigation has been performed is counsel in a position to make informed tactical decisions." *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987). "In assessing the reasonableness of an attorney's investigation … a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

This case involves a "complete failure to investigate." *Debango*, 780 F.2d at 85. Counsel failed to take the obligatory step of calling potential witnesses, starting with the contact list that the government provided in discovery months before trial that identified people in Mohammed's and Jaweed's home town in Afghanistan who knew Mohammed and might be able to provide information relevant to the case or to Jaweed's and Mohammed's past interactions. In fact, counsel evidently forgot that he had been given the contact list. *See* 5/2/08 *Ex Parte* Hearing Tr. at 37. As counsel himself acknowledged, he failed to "follow through" on his previously expressed intent to contact witnesses in Afghanistan. *Id.* at 38. Indeed, as this court previously noted, counsel "expressed to the court his fear

that he had 'been ineffective in assisting [Mohammed]' by failing to follow up on his lead that witnesses in Afghanistan would rebut the government's allegation that he was part of the Taliban." *Mohammed*, 693 F.3d at 196.

Counsel's failure to place calls or otherwise reach out to potential witnesses cannot be traced to any strategic decision. Counsel did not decide against investigating based on any reasoned anticipation that the evidence unearthed or testimony of anyone he might reach would be of limited value or would be vulnerable on cross-examination. *Cf. McDade*, 699 F.3d at 507. Mohammed gave him no reason to think that investigation "would be fruitless or even harmful." *Strickland*, 466 U.S. at 691. Counsel did not and could not know what he would find out had he picked up the phone; he was thus in no "position to make informed tactical decisions." *Barbour*, 813 F.2d at 1234.

Notably, counsel was aware that Jaweed's testimony would be central to the upcoming trial. And counsel took preliminary steps to understand Jaweed's background, including asking the government to search for any official criminal records. But he did not investigate the possibility of Jaweed's bias, despite having some important clues on that score. First, counsel knew several months before trial that, while in custody pending extradition, Mohammed made statements about his history of conflict with Jaweed and about Jaweed's past misconduct "in an attempt to ascribe a motive for Jaweed to fabricate evidence or lie, or otherwise to impugn Jaweed's credibility." *Mohammed*, 2016 WL 3982447, at *6. And, as the district court found, Mohammed told counsel at least a couple weeks before trial that "Jaweed may have a vendetta against Mohammed because Mohammed won a local election" against Jaweed's preferred candidate. *Id.* at *20. Counsel was also aware that Jaweed had once sought

unsuccessfully to marry Mohammed's sister. *See id.* at *14. In light of all that information, the possibility that Jaweed might be biased against Mohammed was clearly worth investigating. *Cf. Wiggins*, 539 U.S. at 527-28 ("[C]ounsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision … impossible.").

We respectfully disagree with the district court that counsel "was under no duty to investigate whether Jaweed was biased against Mohammed when the only information he had about this purported bias was the election." *Mohammed*, 2016 WL 3982447, at *22. Any information about potential sources of bias in a witness as crucial as Jaweed should have led to further investigation. Yet counsel did not investigate, apparently because he mistakenly believed he would need to travel to Afghanistan to do so.

The district court appears to have concluded that counsel could not be expected to take investigative steps that Mohammed did not specifically suggest to him. But even when defendants are "fatalistic or uncooperative," that "does not obviate the need for defense counsel to conduct *some* sort of … investigation." *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Indeed, when defendants are "actively obstructive," they remain entitled to effective counsel. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). "[C]ounsel has a duty to investigate, even if his or her client does not divulge relevant information," *Vega v. Ryan*, 757 F.3d 960, 969 (9th Cir. 2014), and counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware," *Porter*, 558 U.S. at 40. We therefore conclude that Mohammed's trial counsel gave constitutionally deficient assistance in failing to investigate Jaweed's possible bias.

Mohammed also claims that counsel rendered ineffective assistance by failing to timely object—and to lodge a standing

objection—to Jaweed's frequent "interpretations" of his conversations with Mohammed. We agree that a proficient attorney would have promptly objected and, once it became clear the government would repeatedly solicit Jaweed's testimony about Mohammed's state of mind, lodged a standing objection. *See, e.g.*, 5/9/08 P.M. Trial Tr. at 47-53 (government counsel on direct examination repeatedly asking Jaweed to explain Mohammed's meaning, rather than Jaweed's understanding of what Mohammed was telling him). Had Jaweed's entire testimony been confined to what Jaweed understood, not what Mohammed meant—as the district court ultimately suggested it should be, *see* 5/12/08 A.M. Trial Tr. at 27—the jury likely would have better appreciated the limitations of that testimony. Had Mohammed's counsel also independently sown doubt as to Jaweed's credibility, the subtle distinction between Jaweed's actual testimony (about Mohammed's state of mind) and testimony to which Jaweed should have been confined (about what he understood Mohammed to mean) could have been significant. Thus, the failure to object to Jaweed's interpretations should be considered part and parcel of counsel's failure generally to undermine Jaweed's testimony.

## B.

In assessing prejudice, the ultimate question is whether Mohammed has shown a reasonable probability that adequate investigation would have enabled trial counsel to sow sufficient doubt about Jaweed's credibility to sway even "one juror." *Hope v. Cartledge*, 857 F.3d 518, 524 (4th Cir. 2017) (quoting *Wiggins*, 539 U.S. at 537); *Vega*, 757 F.3d at 974 (same). We conclude as to the drug trafficking charge that, as the government put it, "the recordings spoke for themselves and directly implicated Mohammed through his own unequivocal words and conduct." Appellee Br. 44. Even if Jaweed had been effectively impeached and shown to be biased, the jury

would have convicted based on Mohammed's own words. For instance, when informed by Jaweed that the drugs he was selling were bound for America, Mohammed enthused that "the Jihad would be performed since they send it to America." Gov't Ex. 2I at 1. Mohammed himself, speaking on the wiretap, disclosed the requisite knowledge or intent that the drugs he was trafficking would be imported to the United States. *See also* Gov't Ex. 2H at 2-3, 8.

On the existing record, however, we cannot exclude the possibility of prejudice as to the narcoterrorism conviction. Jaweed's testimony was the only evidence that linked Mohammed to the Taliban. It thus provided critical support for the narcoterrorism charge. *See* 5/9/08 P.M. Trial Tr. at 47-53; 5/12/08 A.M. Trial Tr. at 6-8, 28, 32-35, 63, 66. At trial, the government pursued two distinct theories for convicting Mohammed of narcoterrorism—that he had personally engaged in terrorist activity, and that he was "acting as a conduit of the Taliban," a terrorist organization. 5/15/08 Trial Tr. at 50. It is not clear which theory the jury believed. Given the government's own emphasis on the Taliban's role in Afghan drug trafficking and its use of drug proceeds to fund terrorism, *see id.* at 50-51, it is reasonably probable that the jury convicted Mohammed not of being a terrorist who retained drug proceeds for himself, but of using drug sales to fund the Taliban.

Because Jaweed's testimony provided the only unambiguous link between Mohammed and the Taliban, however, it is reasonably probable that the jury would not have convicted Mohammed if Jaweed's testimony could have been effectively undermined. The government objects that the evidence also showed that Mohammed "provided commissions to himself, and that he had engaged and planned to engage in terrorist activity," so that the jury could have convicted without relying on Jaweed to link Mohammed to the Taliban. Appellee

Br. 47; *cf. Griffin v. United States*, 502 U.S. 46, 60 (1991) (refusal to instruct the jury not to consider an "alternative basis of liability that does not have adequate evidentiary support … does not provide an independent basis for reversing an otherwise valid conviction"). But due to counsel's inadequacy, the jury had no way to factor in the missing impeachment evidence. We accordingly cannot safely assume that counsel's performance did not affect the verdict.

We cannot evaluate on the record as it stands, however, the probability that an adequate investigation would have resulted in effective impeachment of Jaweed's testimony. On this point, the district court "focus[ed] its analysis" on the four potential witnesses whom, it found, Mohammed had specifically suggested to counsel before trial. *Mohammed*, 2016 WL 3982447, at *17. The district court concluded that Mohammed had not demonstrated prejudice because he never "established that these witnesses would have been able to testify that any animosity existed between Mohammed and Jaweed." *Id.* at *23; *see also id.* at *4, *24.

The district court's exclusive focus on the four potential witnesses Mohammed named was too limited. As this court previously suggested, it is relevant not just "what Mohammed told his attorney" but also "what his attorney [might] have uncovered himself during trial preparation," starting with the contact list the government provided in discovery. 693 F.3d at 203. As appellate counsel's inquiries illustrated, an adequate investigation would involve following up with witnesses besides the four Mohammed specifically identified in an effort to identify anyone able to testify about what appears likely to be a potent source of impeachment evidence: Mohammed's role in Jaweed's *jirga* and Jaweed's enraged response. *See Mohammed*, 2016 WL 3982447, at *22 (district court acknowledging, even as parties agreed not to postpone trial,

that investigation "might have uncovered some evidence of Jaweed's purported bias towards Mohammed").

On the current record, and without additional district court findings, we cannot confidently assess what a reasonable investigation in 2008 could have found. *Cf. United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016-17 (7th Cir. 1987) (remanding for further proceedings where "the record was not sufficiently developed to allow a comprehensive analysis of the 'prejudice' component of the *Strickland* test"). That incompleteness, in our view, cannot "fairly be characterized as a failure of proof" on Mohammed's part. *Id.* at 1017. It does not appear that Mohammed failed to "show to the extent possible precisely what information would have been discovered through further investigation." *United States v. Gwyn*, 481 F.3d 849, 855 (D.C. Cir. 2007) (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)). Rather, the proceedings in the district court did not reconstruct what an adequate investigation in 2008 could have uncovered and how counsel could have used that information at trial (as fodder for cross-examination as well as direct testimony). *Cf. United States v. Cordova*, 806 F.3d 1085, 1091 (D.C. Cir. 2015) (finding no prejudice based in part on appellants' failure to identify how their cross-examination might have benefitted from additional information).

Reconstruction of what a reasonable investigation could have uncovered was made unnecessary by the district court's conclusions on the first *Strickland* prong, but because we hold that counsel's performance was deficient, this step must be taken on remand. We leave to the district court in the first instance to decide whether more evidence should be introduced—such as testimony from Mohammed's appellate counsel about the investigation he performed, or even a proffer of testimony in some form from the witnesses he contacted.

15

* * *

For these reasons, we affirm in part and vacate in part the decision below and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*